# Exhibit A

*Copy*

PRELIMINARY HEARING OF TERRY ROBERT POWELL
BEFORE DISTRICT JUSTICE THOMAS R. CARR
ON April 20, 1993
CASE #CC-418-93

MC: District Justice Thomas R. Carr
US: Unidentified Speaker
AM: Anthony Miley
PM: Phyllis Morelock
SG: Shelby Greenwald
FA: Mr. Moody's Attorney (?)
CK: Cheryl Kline
ET: Eugene Taylor
SK: Steve Kasmarek
BB: Bruce Bailey

FILED
SCRANTON

DEC 1 4 2000

PER _____
DEPUTY CLERK

MC: Is there any agreement on how you wish to handle this?

AM: We've agreed that they're going to keep the incidents separate. They will, I guess, start with the Highway Oil?

US: That would be correct.

US: And then cross examination at the end of that and then we'll proceed.

MC: Both co-defendants at the same time?

AM: Yeah. Yes, sir.

MC: Okay. If those going to testify in the Highway Oil case would please stand and raise your right hand.

(Witnesses sworn.)

MC: Okay. Be seated.

US: Your Honor, if we're going to do it chronologically, the Holiday Inn is the first case.

AM: Holiday Inn? Fine.

MC: Okay. Would you two ladies please stand and raise your right hand?

1

48ia

(Witnesses sworn.)

MC:  Okay.  Any amendments to your complaint?

US:  No, sir.

MC:  Either defense attorneys wish the complaints read?  Do you waive your reading?

AM:  We waive the reading.

MC:  Okay.  You may proceed.

US:  The Commonwealth calls Shelby Greenwald.

MC:  Come forward and take the stand, please.

US:  Ms. Greenwald, can you tell us your full name and your place of employment, please?

SG:  Shelby June Greenwald, Holiday Inn Express.

US:  Pardon me?

MC:  Speak up.

SG:  Holiday Inn Express.  I have a cold.  I'm sorry.

MC:  Okay.  Just a little bit.  Then turn your chair that way so we can all hear you.  Okay?

US:  And were you so employed on March 27th of 1993?

SG:  Yes, I was.

US:  And can you describe your duties at the Holiday Inn Express, please?

SG:  I'm the night auditor.

US:  Where is the Holiday Inn Express located?

SG:  869 York Road.

US:  Do you know what township that is?

2

485

SG:  Yes.

US:  Can you describe to the Judge where he's at or show him to us?

SG:  Right there.

US:  Your Honor, the Court would take notice that she's identified the defendant, Powell, in this particular matter.

MC:  So noted.

US:  Is there any doubt in your mind that that's the man?

SG:  No.  The nose is very prominent.  I remember that.  The mustache is not there anymore but...in the facial features.

US:  This picture was taken (INAUDIBLE).  I'm going to mark this.

MC:  We'll mark it as Commonwealth Exhibit 1.

US:  Ma'am, I'm handing you what's been identified as Commonwealth Exhibit #1.  Could you describe what this is?

SG:  That's the mustache and the nose.  That's the one I saw that night.

US:  That...the photograph that you have in your hand is of who, again?

SG:  Mr. Powell.

US:  And, again, is that the individual...is his likeness, is that his likeness on the evening of March 27th?

SG:  Yes, the way it would face, and the nose.

US:  If you would just set that up there.  After you handed Mr. Powell the money, what did you do next?

SG:  I asked him if he wanted the change.  He said, no, and he told me to take the drawer out.  He wanted to see what was under it.

US:  And did you do that?

SG:  Yes.

6

485

US:   Following the removal of the drawer, what did you do next?

SG:   Then he asked me if there was any other money there.  I said, no. He asked me if I could open the safe.  I said, no.

US:   What happened next?

SG:   Then he left and he said, get down and don't come out the door.

US:   Did you get down?

SG:   No.

US:   Did he walk away, run away?

SG:   He was going very fast.  I saw him go down through the lot, the parking lot.

US:   In which direction was he headed?

SG:   He was heading towards Comfort Inn.  We had cars parked there so I couldn't see how far down he went.

US:   During the events that you've just described for us, can you tell us how you felt?

SG:   When I was standing at the register I was scared because I didn't know if he was going to shoot me after I handed him the money.

US:   Did you see anybody else with Mr. Powell on this --

SG:   No.

US:   -- I have no other questions.

MC:   You may cross.

FA:   I have no questions.

MC:   You may cross.

AM:   Thank you.

MC:   Pardon me?

AM:   I said thank you.

7

490

MC:  Oh, I thought you said --

AM:  No, no, no, no.

MC:  -- I thought you said no questions.  Okay.  Go ahead.

AM:  Ms. Greenwalt...Greenwald, excuse me.  You...I assume after this
     incident occurred you called the police right away, is that
     correct?

SG:  I called Comfort Inn first because I thought he might be heading
     there next and then I called the police.

AM:  Okay.  And about what time did they arrive?

SG:  About a quarter or ten of three.

AM:  And about how many minutes was that after --

US:  Your Honor, I'm going to object to being outside the scope of
     direct examination.

AM:  -- how could it be outside when we're getting to the foundation
     for (INAUDIBLE).

SG:  I really wasn't looking at the clock at that point, Judge.

US:  Your Honor, I'm going to object again.  The direct examination
     ceases at the point in time when Mr. Powell exited the building.
     Any identification made by this witness was made here in the
     courtroom today.  Anything else would be irrelevant stuff.

AM:  Well, it can't be irrelevant because her identification here
     today is based on a previous identification and that's what I'm
     trying to establish.  If the Court will give me a few question
     leeway I'm sure I can make this relevant.

MC:  Okay.  You may ask a few questions.

AM:  Thank you.  Do you know approximately how long?  15, 20 minutes
     maybe?

SG:  Probably about 15.

AM:  Okay.  Thank you.  Now, prior to this particular day back on
     March 27th, did you ever see this man before?

8

491

SG:  Not to my knowledge.

AM:  Okay.  Did you ever hear his name before?

SG:  No.

AM:  Did you ever hear it on TV before?

SG:  No.

AM:  Okay.  How after the incident?

SG:  After they were picked up I saw it in the paper.

AM:  Okay.  But not before?

SG:  No.

AM:  Did you give a description to the police at that point?

SG:  Yes.

AM:  Were you shown a photo lineup?

US:  Your Honor, I object.  Again, it's outside the scope of the direct examination and has no bearing upon the testimony she gave.

AM:  Well, if the Court remembers, the Commonwealth produced the photograph and that photograph, I believe, was shown to the witness here.

US:  The photograph has nothing to do with any photo lineup.

AM:  Well, we don't know that yet because I haven't asked any questions, haven't gotten to that point yet but we at least know a photo was shown to the witness and I'd like to explore that.

MC:  Well, I think if he asks the question, if this was the photo in the photo lineup, I'll allow that but beyond that I'm going to sustain the Commonwealth's objection.

AM:  Okay.  Have you ever seen that photo before?

SG:  That one?  No.

9

492

AM:   You never saw that photo?

SG:   Not that one.

AM:   Not that one.  You did see another one?

SG:   Another one, yes.

AM:   Okay.  And do you recall..did that photo look similar to that one there?

SG:   Uh-huh.

AM:   Very similar?

US:   Your Honor, I'm going to object again.  He's going potentially in the same direction with the same renewed objection.

AM:   No.  She indicated she saw another photograph which was based --

US:   She didn't indicate that on direct examination.

MC:   I'll sustain the objection.

US:   Thank you.

AM:   Now, do you recall when you gave this description to the police, that you were given the opportunity to see photographs of several people?

SG:   That night?

US:   Your Honor, again I'm going to object.

AM:   Your Honor, identification is a crucial element in the Commonwealth's case.  What are they afraid of?  They had this witness identify this person.  That is fertile ground for cross examination.  If you can't cross examine a person on identification which is a crucial part to tying an alleged defendant to a crime, what good is a preliminary hearing?  That is the burden that the Commonwealth puts on me, not to try to shun that opportunity.  Now, the opportunity is they introduced identification testimony, I can cross examine it...cross examine her on her ability to identify this defendant in light of the fact that her testimony is different when she gave a description earlier.

10

493

US: Mr. Miley (INAUDIBLE) quite easy here but, quite frankly, she's identified in court here today Mr. Powell as the individual who pointed the gun at her during the commission of this crime. Other than that, he has no right to examination outside that testimony. The Commonwealth has proved its burden or met its burden by identifying the defendant as the person there.

MC: Well, she didn't testify and it wasn't brought out in direct examination by any kind of photo lineup and I'll sustain the last --

AM: My question wasn't photo lineup. My question was --

MC: -- you were leading up to that and that's...I'll now sustain the objection.

AM: -- okay. As to the photo lineup, that's fine. Now, you described...you described the individual who robbed this place as an individual who looked most like a certain person. Do you recall telling Trooper Taylor that?

SG: I said the facial features looked the same. That's all I said.

AM: And then you related that a specific person looked the most like the subject who robbed you. Do you remember saying that?

SG: I said the mustache was not the same.

AM: Uh-huh. Do you remember telling Trooper Taylor that Mr. Moody is the individual who looked the most like --

US: Your Honor, I'm going to object. Again, it's outside the scope of direct examination.

AM: Now how could that possibly be outside the scope of direct?

US: Any conversation between Ms. Greenwald and Trooper Taylor was that she didn't testify to it.

AM: It's her identification.

US: She identified the defendant here today.

AM: She also identified Mr. Moody.

SG: No.

11

494

AM:  Two identifications.

MC:  I'll allow the witness to answer that.

SG:  I didn't identify him.  I said he...his facial features were the same, which they are.

AM:  Who...whom did you say the facial features were --

SG:  His facial features were --

AM:  -- pointing to Mr. Moody?

SG:  -- yes.

AM:  So --

SG:  I did not say he was the person.

AM:  -- so when it says in here that you related that, Moody looked the most like the subject who robbed her, you never said that? That's Trooper Taylor's own words?

SG:  Yeah, I said the facial features look most like it.

AM:  And you were relating to --

SG:  But the mustache was not the same.

AM:  -- the mustache was not the same?

SG:  Yes, he...it wasn't the whole way down around here.  It was cut off right here.  Just as in the picture.

AM:  So this person had sunglasses on, is that right?

SG:  Yes.

AM:  And they had a hood over their hair?

SG:  Yes.

AM:  So you can't identify what color hair they had?

SG:  No.

12

495

AM:  You could tell that they were white or black or Hispanic?

SG:  Yes, they were white.

AM:  All right.  So the picture that Mr. Leonetti just showed you had
     a picture of an individual with a mustache in it, is that right?

SG:  This one.

AM:  Yes.  Did this person have a mustache when you told
     Trooper Taylor that the facial features are --

US:  Your Honor, I'm going to object.

FA:  I'd object, too.  She testified that she didn't see anyone else.
     She saw one person and she identified him as this individual.  I
     don't know how she would know, you know, whether any...it's
     irrelevant whether someone else had a mustache.

AM:  Well, that seems to be the basis for her identification, is that
     right?

SG:  No.

FA:  Wait.

MC:  Just a second.  What's the question again?  Did this person have
     a mustache?

AM:  In this picture.

MC:  Referring...is that the question?

AM:  That was my first question.  I think she said yes.

MC:  Yes.

AM:  Second question was --

MC:  Did this person have a mustache?

AM:  -- she's previously identified...testified that she said she was
     shown the picture in which she said that this person, pointing to
     Mr. Moody, had facial features that were very similar to this
     individual here.  And I asked her the facial features that she
     was talking about, was that a mustache.

                              13

                                                    496

SG: No, the face --

MC: Just a minute, ma'am.  I've got to rule on the objection.  And your objection?

US: He's pointing at Mr. Moody when he's saying about does this person have a mustache, and she hasn't testified that she ever saw Mr. Moody.

FA: That's right.

US: She testified that she saw Mr. Powell.

FA: That's my objection also.  She testified that she saw one person, she identified Mr. Powell, and she said she didn't see anyone else.

MC: I'll sustain the objection.  Don't answer the question.

AM: How long did this encounter occur from the time the individual entered until he left?

SG: It was just a few minutes.  It was very fast.

AM: One minute?  Two minutes?

SG: Two to three minutes.

AM: And he spoke with you, is that right?

SG: Yes.

AM: Have any accent?  Dialect?

SG: Yes, I noted...I don't know if it was quite an accent, a speech impediment.

AM: Well, what kind of speech impediment?

SG: He was drinking.  I don't know.  It was something.

AM: What did you hear?  A slur?  A lisp?

SG: Yes.

AM: A slur?

14

497

SG:  A lisp.

AM:  On what particular sound?  S?  T?  What?

SG:  I don't remember.  I just know I heard it.

AM:  Let me ask you this.  If you ever heard the voice again, would
     you be able to identify that?

SG:  I don't know.

AM:  How about slang?  Any use of slang, anything like that?

SG:  I don't think so.

AM:  So it didn't sound Brooklyn, New York, New Jersey?

SG:  He didn't speak that much for me to catch that.

AM:  But enough for you to catch a lisp?

SG:  Yes.

AM:  Were you able to observe the individual walking in to the store
     or the --

SG:  The top half, yes.

AM:  -- okay.  When the individual walked out?

SG:  Yes.  I was standing at the counter and he walked out.

AM:  Did you observe any kind of a limp?

SG:  I don't know.  I was very nervous at the time.  I know he walked
     fast.

AM:  He walked fast.  How tall would you describe this individual?

SG:  About 6'3".

AM:  Now, I couldn't help but notice that before the hearing you
     stepped into the hearing room when these two individuals were
     sitting here.  For what purpose was that?

US:  Your Honor, I'm going to object again.

15

498

AM:   Well, if that's a basis for identification it's certainly
      relevant, Judge.

MC:   Answer the question.

SG:   I looked in to look at them.

AM:   You weren't sure, were you?

US:   Your Honor, I'm going to object.

SG:   I was sure.

AM:   Then why'd you look?

MC:   Just a minute.

AM:   Never mind.  I'll withdraw.

SG:   Because I hadn't seen this gentleman before.

AM:   Which gentleman?

SG:   I wanted to make sure which one.

AM:   Which gentleman?

SG:   Mr. Moody.

AM:   You've never seen him before?

SG:   No.

AM:   You've never seen a picture of him before?

SG:   I've seen a picture of him.  I didn't see him in person.  The
      picture's different.

AM:   The picture is different?

SG:   Yes.  The lighting.

AM:   Is the lighting different in this one?

SG:   That one?

16

493

AM:   Yes.

SG:   No.

AM:   No?  How about these scars?  Did you notice any scars on this individual's face?

SG:   No, I didn't notice any.

AM:   What color were the person's eyes?

SG:   He had sunglasses on.

AM:   What color were the sunglasses?

SG:   Black.

AM:   So what was the comment about the nose that you indicated?

SG:   It looked like a Grecian nose.

AM:   Is that from a profile you can see the slope?

SG:   No, from the front.

AM:   A Grecian nose?  What is a Grecian --

SG:   The way it came straight down.

AM:   -- was it thin?

SG:   Yes.

AM:   Thin.  Definitely not broad.

SG:   On the front top part I'm talking about.

AM:   Did you have any profile?

SG:   No.

AM:   When you looked at this individual, did you notice any profile of the individual?  Never saw a side shot of this person?

SG:   I don't remember.

17

500

AM:  Let me show you this picture, and is it your testimony that this is a thin nose?

SG:  Yes.

AM:  That's a thin nose?

SG:  Yes.

AM:  And prior to your identification here today you made previous identifications of the alleged perpetrator?

US:  Your Honor, I'm going to object.

MC:  Sustained.

AM:  You're pretty good at judging ages, ma'am?

SG:  No, not --

AM:  You're not?  See that gentleman in the green shirt back there? How old does he look?

SG:  -- 39.

AM:  How much?

SG:  39 or 40.

AM:  Well, Mr. Long, I don't know.  Do you have any video cameras in that place?

SG:  No.

AM:  Nothing that faces the cash register or you or anything like that?

SG:  No.

AM:  Any other witnesses that you know of?

SG:  No.

AM:  Just you.  Were you pretty tired that night?

SG:  No, I was pretty scared.

18

AM:    Pretty scared.  I mean before this happened were you pretty tired?

SG:    No.

AM:    No?  I noticed you mentioned the name, when that picture was shown to you, Mr. Powell.  Where did you learn that name?

SG:    It was in the newspaper.

AM:    In the newspaper.  Was there a photograph in the newspaper as well?

SG:    Yes, but it wasn't a very good one.

AM:    And on TV, I guess, the name Mr. Powell you learned it from there?

SG:    No, I didn't see anything on TV about it.

AM:    Oh, one other question.  His build, what was his weight?  Could you approximate the weight?

SG:    About 180.

AM:    180?  Okay.  I know this may sound ridiculous but I got to ask you.  How...was it a male or female that was there?

SG:    Male.

AM:    And you're sure about that?

SG:    Uh-huh.

AM:    And how is it that you're sure?

SG:    I don't see too many women who are 6'3".

AM:    Is that the only way?

SG:    Well, the hands.  I mean, they didn't look feminine.

AM:    Not the mustache didn't give it away or anything?

SG:    Well, yeah, the mustache.

19

502

AM:  All right.  All right.

SG:  I don't see too many women with mustaches.

AM:  Okay.  Thank you very much, ma'am.  I have no further questions.

MC:  Just a minute, ma'am.  Do you have any redirect?

US:  One more question, ma'am.  As you're here today, is there any
     doubt that the individual that you previously identified in the
     courtroom here today is the man you saw on the evening of
     March 27th?

SG:  No doubt in my mind.

US:  Thank you.

MC:  Any cross?

AM:  No doubt in your mind?

SG:  No.

AM:  Even though you had to come in and...before the hearing began and
     take a second look you're saying you have no doubt?

SG:  No.

AM:  And no doubt even though you previously identified another person
     you have no doubt?

SG:  I didn't identify another --

US:  Your Honor, I would object.

MC:  Just a minute, ma'am.

AM:  Thank you.  I have no other questions.

MC:  You may step down, ma'am.

US:  Thank you.  I call Ms. Cheryl Kline.  Could you please tell us
     your name and place of employment?

CK:  Cheryl Kline, Holiday Inn Express.

20

503

US: And were you so employed on March 27th, 1993?

CK: (INAUDIBLE).

US: (INAUDIBLE) as the Holiday Inn Express manager?

CK: I'm the manager there.

US: In the early morning hours of March 7th, 1993, did you have an incident reported to you?

CK: Yes.  I received a phone call from Jean at about a quarter of three.

US: And who's Jean?

CK: Shelby Jean.  She goes by Jean.

US: And as a result of that phone call, did you go to your place of employment?

CK: I went immediately.

US: And could you describe to us what you did upon your arrival?

CK: Jean was there with Officer Taylor and I asked her to describe to me what happened, and she described the same thing she described to you, and I counted the drawer to see what was missing.  I offered to finish Jean's shift for her so she could go home.

US: When you say you counted the drawer, can you explain that process to us?

CK: Sure.  We keep a standard amount in our cash register.  It is counted at the end of each shift.  Any money taken in is dropped in a safe and so it's very easy to look at our cash sheet and our cash drawer and know exactly what we have at all times.

US: And did you perform this function on March 27th following the incident that's been described?

CK: Yes, I did.

US: And what was the results of that inspection?

CK: We were missing $337.

21

504

US:   Even?

CK:   Even.  He didn't take the change.

US:   And would that be money that was in the control of Ms. Greenwald?

CK:   Yes.

US:   That's all.

MC:   Cross?

FA:   No cross, Your Honor.

AM:   Did Ms. Greenwald tell you whether or not this alleged perpetrator touched anything?

CK:   Touched anything?  Well, in describing the incident, she said that he did not reach in the cash drawer.  He made her do it because he was wearing gloves.

AM:   Wearing gloves?

CK:   Yes.

AM:   Did she happen to say what kind of gloves?

US:   Your Honor, I object.  Any answer given would be hearsay.

AM:   It's your witness.  She just testified as to what this person described.  If there's any hearsay objection it's their witness. They can certainly cross examine her.  (INAUDIBLE).

MC:   Answer the question.

CK:   Would you repeat it?

AM:   Sure.  Did she happen to describe the gloves color, anything?

CK:   I think she did to the policeman, not to me.

AM:   Not to you?

CK:   Yes.

AM:   But she definitely said gloves?

22

CK:  She did say gloves.

AM:  Thank you, ma'am.  I have no further questions.

US:  I have no redirect.

MC:  You may step down, ma'am.

CK:  Thank you.

US:  Call Trooper Taylor.  Would you please state your name and place of employment?

ET:  I'm Eugene Taylor (INAUDIBLE).  I've been so employed for over 11 years.

US:  And were you so employed on March 27th, 1993?

ET:  Yes, I was.  I was contacted at my residence to respond to a robbery call.

US:  Can you describe your duties with the State Police?

ET:  Yes.  At that time I was a Criminal Investigator with the State Police assigned to the Gettysburg Substation.

US:  And, Corporal Taylor, you've subsequently been promoted and transferred?

ET:  That's correct.  Over to Chambersburg Franklintown.

US:  Upon responding to this call, where was that call to?

ET:  The call was to the Holiday Inn Express which is approximately 300 feet south of State Route 30 in Strabane Township, Adams County.

US:  And who did you meet when you arrived there?

ET:  Shelby Jean Greenwald who testified earlier today.

US:  You were in court earlier today to hear her testimony?

ET:  Yes, that's correct.

US:  And would that be a fairly close rendition of the facts she gave

23

you?

ET:  Yes.

US:  On this particular morning.  Did you conduct your
     investigation at the scene?

ET:  Yes.  Yes, I did.  I was with her for quite a considerable amount
     of time.  I had occasion to return and speak with her on various
     different occasions, speak with her along with speaking with the
     manager.

US:  As a result of your investigation, did you have an occasion to
     make an arrest or bring charges in this matter?

ET:  Yes.  Initially, charges were brought against Timothy Moody, Jr.
     He was arrested on the 31st of March.

US:  Where did that arrest occur?

ET:  That arrest occurred at the Adams County Prison in Cumberland
     Township.

US:  Did you take any statements from Mr. Moody?

ET:  Yes, I did.  On the 31st, in the late afternoon hours, I had
     occasion to take a taped statement from Mr. Moody at which time
     he implicated himself as being involved in this robbery.

US:  And what was his involvement?

ET:  He related he was the operator of the vehicle at the time this
     robbery occurred.

US:  Did he state if anybody else was along?

ET:  Yes.

AM:  I object.  I think Bruton is certainly applicable here unless
     Mr. Moody is planning on taking the stand.  Anything that
     Mr. Moody said to implicate the co-defendant is certainly
     inadmissible.  Mr. Moody (INAUDIBLE).

US:  Withdraw the question.  Did he go into any detail about his
     activities in this criminal action?

24

507

ET:   Yes, he did.  The tape was quite considerable in length.  I think
      a transcript was obtained of it.  Essentially he related that
      they had been in the Gettysburg Borough earlier in the evening.
      His mother had been with him.  She was left at RBI's in Southlawn
      along with another subject by the name of Terry Powell.

AM:   Objection.

ET:   And left --

AM:   Objection.  Objection, please.  I would ask that...that goes
      right into the objection before, ask that (INAUDIBLE) disregard
      that statement.

MC:   Well, it's possible to honor (INAUDIBLE).

AM:   Thank you.

MC:   From now on just use another subject.  Don't mention any names.

ET:   Another subject within had left that location, went to obtain a
      CO-2 gun and, subsequent to that, they went to the Holiday Inn
      Express.

US:   Did he relate to you any conversation that he may've had with
      another subject in regard to what they were going to do?

ET:   Yes.  There was some discussion, not very much discussion as far
      as what was going to occur, but the discussion was concerning
      going to get the gun, going to obtain the gun, then they were
      looking for a place, essentially.

US:   And he described his actions at the Holiday Inn Express as what?

ET:   He operated the vehicle.  He parked on the west side of the
      Holiday Inn Express, parked there with another subject left the
      vehicle dressed as Ms. Greenwald had described earlier, went in,
      came back out with an amount of cash, which I can't recall
      specifically the amount he told me, but he had an approximate
      amount that had been taken from inside.

US:   In the course of your investigation, did you speak to Mr. Powell?

ET:   Yes.  He was subsequently arrested.  After Mr. Moody's interview
      he was subsequently arrested and after...upon arrest, after the
      warrant was read to him, the charges, after he was read his

                              25

Miranda warnings, without me even asking anything about any type of gun or anything like that, he related to me he could take me to where the gun was.

US: As a result of your investigation, the charges that we're here on today were filed?

ET: That's correct.

US: That's all I have.

MC: You may cross.

FA: Okay. Officer Taylor, did you have any discussion with Mr. Moody prior to asking him questions about (INAUDIBLE)?

ET: Yes, I did. I related to him that I would give him one opportunity to give me a statement as far as his involvement and his knowledge concerning the robberies that had occurred. He would be given one opportunity only. I stopped along the roadway. I related to him from this roadway went to the barracks where he could make a statement, the other roadway went to the prison where I would take him and I stated the decision was his to make whether he wanted to go make a statement. This is the only time he would ever be allowed to make a statement to myself as far as this investigation.

FA: Okay. It was my understanding from your testimony that you arrested him at prison.

ET: That's correct. Yes. He was taken before Magistrate Deerdorf_ and arraigned on the charges and, subsequent to that, I had given him the opportunity to make a statement which --

FA: Okay. He was arrested at what prison?

ET: -- Adams County Prison.

FA: He was already in prison?

ET: That's correct.

FA: On other unrelated charges, is that right?

ET: Not related to the charges I brought, other robbery charges. I'm sorry. It was...I'm sorry. I must apologize. That was for a

26

509

parole/probation violation.

FA: How long...do you know how long he had been in prison prior to you going out there and arresting him?

ET: He was arrested on the warrant, if I recall correctly, it was the 30th. Yes, the 30th.

FA: When you arrested him.

ET: The day before...the day before essentially at his residence he was arrested on a probation/parole warrant.

FA: Okay. Did you give him his Miranda warnings?

ET: At what point?

FA: When you arrested him on these new charges.

ET: On these new charges? He was advised at the State Police Barracks in Gettysburg prior to taking a statement from him, yes.

FA: Okay. Was that before or after you were going along the road and you stopped where the road leads to the prison or the police barracks?

ET: That was after.

FA: You gave him the Miranda warnings after that?

ET: That's correct.

FA: Did you have any other discussion in the car on the way to the police barracks?

ET: On the way to the police barracks? There was general conversation the whole time between him and I, and Trooper Hatfield was also present.

FA: Do you recall the nature of the conversation?

ET: He was upset because he was getting charged with this because he wasn't the one that actually committed the robbery, that there was another subject who committed robbery and he was upset. And we explained to him that the investigation, that probable cause has led to...the investigation has led to enough probable cause

27

510

to arrest him for the offenses and that's why he was being
arrested.

FA:    Okay.  At this point he was under arrest in the car but he had
not received his Miranda warnings?

ET:    That's correct.  He essentially wasn't being interrogated at that
point relative to his involvement.  He had numerous statements as
far as he wasn't the one that --

(Tape change.)

FA:    (INAUDIBLE).

ET:    Well, essentially this was all after even he had said he would
give a statement.  Essentially, at the point he said that he
would give a statement was when I told him I would give him only
one opportunity to make a statement, and only one opportunity,
and this was his opportunity to make a statement.  I stopped
along the roadway and I said to him, I said, this road goes to
the State Police Barracks where you can make a statement, this
road goes back to prison where you...I'll take you back to the
prison, I said, and I won't ask for another statement from you.
He said go to the State Police Barracks and that's what I
essentially did.  I went out and I took a taped statement from
him.

FA:    Officer Taylor, did you make any comment to (INAUDIBLE) that
Mr. Powell was testifying here today in this matter?

ET:    No, I did not say that.  I said that Mr. Powell was still out.
There were charges pending against him.  Then he would also be
given the opportunity to make a statement.  That's what was told
to him.

FA:    Did you make any comment about Mr. Moody being away from his
child for a long time?

ET:    No.

FA:    You ddin't?

ET:    No, I didn't even know he had a child.  Later...later on there
was some discussion about his boy and so on later on after the
interview and I said, well, I can make arrangements to bring him
to the barracks but that was after the interview.  Those

28

arrangements were made after the interview.  But in no way was that done to try and get him to make a statement.  Essentially that was done on my own as a showing of my sincerity to him as far as him making...cooperating with us, but that was done after. He had no knowledge prior to make a statement that I would do something like that.

FA:    What do you mean by your sincerity in having him cooperate with you?  What do you mean by that?

ET:    Well, I was appreciative of the fact that he was making a statement so the only thing I did was I said, well, I can make arrangements for someone to bring your boy up here for you. That's what I did.  As a matter of fact, I got him something to eat because I knew he wouldn't get something over at the prison because it was after supper.  I got him something to eat.

FA:    So they get treated better if they make a statement.

ET:    No.  No, I'm not saying that at all.

FA:    But you were willing to get him something to eat and bring his child to see him and you wanted him to --

ET:    That's just the type person I am.

FA:    -- you wouldn't have done those things if he didn't make a statement.

ET:    No, I would've taken him back to the prison.  He would've never been at the barracks, I never would've had that opportunity to do something like that.

FA:    Okay.  No further questions.

MC:    Mr. Miley?

AM:    You indicated that you had read Mr. Powell his rights, is that correct?

ET:    That's correct.

AM:    Did he sign a waiver, sir?

ET:    No, I have a Miranda card I carry in my wallet which I pulled out and read them...his warnings off my Miranda card.

29

AM:  You don't have a waiver form with you as well?

ET:  At that point I don't know if I did.  It would've been a little hard for him to sign when he was in handcuffs.

AM:  Did you have a waiver form for Mr. Moody?

ET:  Yes.  Yes.  Essentially prior to him making a statement...there was no statement that was going to be taken from Mr. Powell. There was a statement that was going to be taken from Mr. Moody so I asked him to sign a waiver.

AM:  Okay.  Now, as I understand the chronology of things, you read the charges to Mr. Powell?

ET:  That's right.

AM:  Where was he at the time?  In prison?

ET:  He was seated in the back of the patrol vehicle.

AM:  Okay.

ET:  At the time I read him...I explained to him I had warrants for arrest.  He was taken...the area where we have contact with prisoners, there's a lot of other people around and I don't feel it's a very good spot to be reading somebody...it's fairly serious charges there and I felt it would be more appropriate to read them in privacy so we took him out to the patrol vehicle. We seated him in the rear of the patrol vehicle where he was read his Miranda warnings.

AM:  Okay.  And you read all of...you read the complaint to him, is that right?

ET:  That's correct.

AM:  Right off the sheet?

ET:  That's correct.  I read it word for word.

AM:  Word for word so when we get into terroristic threats and it says that, in that defendant did point a gun at Shelby Jean Greenwald, blah, blah, blah, you read that to him?

ET:  Yes.

30

513

AM:  And it's only after you read this complaint then, you're saying, Mr. Powell said I can show you where the gun is, is that right?

ET:  Yeah.

AM:  Did he describe the gun to you?

ET:  No, I don't think we went into that.  Of course, at that point --

AM:  Well, you answered the question.  Thank you, sir.  Did you bring Mr. Powell any treatment, any special treatment in exchange for his statement to you?

ET:  -- he didn't make a formal statement to me.

AM:  Well, that comment about the gun.

ET:  That statement was even taken, it was an utterance on his part. I never even questioned him relative to any guns or anything like that.  He was...he felt that --

AM:  Well, no, I didn't ask you what he felt.  Thank you.  You answered my question.  Now, you began your testimony by stating that Ms. Greenwald gave you a certain rendition of facts, is that right?

ET:  -- she related to me, right, the circumstances.

AM:  As a result of the rendition of those facts, you then arrested Mr. Moody, is that correct?

ET:  That's correct.

AM:  Not Mr. Powell.

ET:  I had probable cause to arrest Mr. Moody.

AM:  Not Mr. Powell at that point.

ET:  Not at that point.

AM:  And this was after she rendered facts relating to identification to you, is that right?

ET:  Yes.  Thank you.  I have no questions.

31

514

MC:    Redirect?

US:    No.

MC:    You may step down.  Do you have any further witnesses?

US:    No, sir.

MC:    Do you wish to make a motion on this particular case or call a witness?

FA:    No.

AM:    I have no witnesses.

MC:    Both defendants will be held for the next term of the Adams County Criminal Court in the Holiday Inn Express robbery.  Both bails will remain in effect.  Hearing is adjourned.  The witnesses may be excused on the Holiday Inn Express case.

US:    Thank you.

MC:    Would you like a quick recess?

FA:    (INAUDIBLE).

MC:    I'll give you five minutes.

       (Recess.)

*Seperate Case*

MC:    Okay.  The witnesses have been sworn.  Any amendments to this complaint?

US:    No, sir.

MC:    Do you wish the complaint read?

US:    No.

MC:    Okay.  You may proceed.

US:    Call Mr. Steve Kazinsky.

MC:    Kazinsky?

SK:    Kasmarek.

515